James Hamilton
Patient No.: 1475-3
Coalinga State Hospital
P.O. Box 5003
Coalinga, CA 93210-5003

*Plaintiff in Pro Se*

FILED
CLERK, U.S. DISTRICT COURT

Nov 24, 2014

CENTRAL DISTRICT OF CALIFORNIA
BY: KMU         DEPUTY

# UNITED STATES DISTRICT COURT

## __NORTHERN__ DISTRICT OF CALIFORNIA

__James Hamilton__,  )  Case No. EDCV 14-2389 CJC (E)
           *Plaintiff,*  )
                )  **Civil Rights Complaint Pursuant to**
     Vs.        )  **42 U.S.C. §1983 (non-prisoners)**
                )
CLIFF ALLENBY, Director of California  )
Department of State Hospitals, AUDREY  )
KING, Executive Director of Coalinga State  )
Hospital, TOM VOSS, Former Executive  )
Director of Coalinga State Hospital, PAM  )
AHLIN, Former Executive Director of  )
Coalinga State Hospital, STEPHEN  )
MAYBERG, Former Director of California  )
Department of Mental Health,  )
           *Defendants.*  )


RECEIVED
CLERK, U.S. DISTRICT COURT
NOV 17 2014
CENTRAL DISTRICT OF CALIFORNIA
BY             DEPUTY


LODGED
CLERK, U.S. DISTRICT COURT
NOV 19 2014
CENTRAL DISTRICT OF CALIFORNIA
BY             DEPUTY

### I. JURISDICTION

1. This court has jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1343. Federal question jurisdiction arises pursuant to 42 U.S.C. §1983.

### II. VENUE

2. Venue is proper pursuant to 28 U.S.C. §1391 (b)(1) because Plaintiff resided within SAN BERNARDINO County and 28 U.S.C. §1391 (b)(2) because Plaintiff's commitment proceedings are taking place within the CENTRAL District of California, namely in SAN BERNARDINO County Superior Court.

### III. PARTIES

3. Plaintiff resides at Coalinga State Hospital, P.O. Box 5003, Coalinga, California 93210-5003.

4. Defendant Audrey King is the Executive Director of Coalinga State Hospital.

5. Defendant Cliff Allenby is the Director of the California Department of State Hospitals.

6. Defendant Tom Voss is the Former Executive Director of Coalinga State Hospital.

7. Defendant Pam Ahlin is the Former Executive Director of Coalinga State Hospital.

CIVIL RIGHTS COMPLAINT

8. Defendant Stephen Mayberg is the Director of the California Department of State Hospitals.

9. These Defendants are sued in their official capacities.

10. These Defendants were acting under color of law as they had custody of the Plaintiff, during the period the Plaintiff was ordered by the California Superior Court (County of SAN BERNARDINO), pursuant to Defendants' Sexually Violent Predator Act (herein 'SVPA') proceedings, to be housed under Defendants' custody. Defendants are, or were, the most senior supervisors responsible for Plaintiff's housing and mental health treatment and are, or were, ultimately responsible for the management of Coalinga State Hospital's staff wherein Plaintiff is housed.

## IV. STATEMENT OF FACTS

11. The SAN BERNARDINO County District Attorney filed a petition, pursuant to the SVPA, in the California Superior Court (County of SAN BERNARDINO) contending that Plaintiff required mental health treatment and that such treatment needed to be within an inpatient setting due to Plaintiff's being "likely" to commit sexually violent predatorial offenses if he were released into the community irrespective of whether they were adequately supervised within the community.

12. Plaintiff is held, despite the absence of any pending criminal charges or sentence, at a prison named Coalinga State Hospital due to California Superior Court (County of SAN BERNARDINO) having ordered Plaintiff be prohibited from taking part in outpatient treatment pursuant to the SVPA by the California Superior Court (County of SAN BERNARDINO).

13. On, or about, MARCH 2012 Defendant PAM AHLIN accepted Plaintiff HAMILTON into their custody, and the Defendants continued to keep Plaintiff HAMILTON within their custody from that point to present, despite knowing that he would (i) be subjected to conditions that were excessively restrictive in relation to the purported purposes of the Sexually Violent Predator Act (herein 'SVPA') and (ii) be irrationally denied the substantive benefits of outpatient treatment. The evidence of such facts are the existence, within the public domain, of data demonstrating that the Defendants were fraudulently purporting to have rationally "assessed" Plaintiff HAMILTON despite Defendants' awareness that such assessments were irrational. Such "assessments" were deemed by Defendants to have demonstrated that Plaintiff HAMILTON was "likely" to commit a "sexually violent predatorial" offense if released into an outpatient treatment program irrespective of whether he was supervised in the community despite Defendants' awareness that such "assessments" were so irrational that any of their results could not be deemed even remotely accurate nor reliable.

**(a) California's Assessment Fraud Scheme**

14. An independent court appointed auditor determined that the State of California has for several years systematically engaged in behavior to defraud metal health patients of adequate care[1]. Such methodology engaged in by the State of California to do so involved informing courts, that were alerted to the state's inadequate mental health care conditions, that the state was aware of its shortcomings and that the state would remedy the problems only up until the point that court ordered oversight was removed. Upon such removal of oversight, the State of

---

[1] *Coleman v. Brown*, United States District Court, Eastern and Northern Districts of California, Case Nos.: 2:90-cv-0520 LKK JFM, C01-1341 TEH.

California would systematically revert back to similar inadequate conditions to the detriment of the mental health patients.

15. The environment, as evidenced by the above-noted court report, of the State of California's disregard for the rights of mental health patients provides a ripe setting for what Petitioner, and those similarly situated, have been subjected to under the guise of "treatment".

16. The Government of the State of California (i) fraudulently purported to possess actuarial tools that could accurately identify those sex offenders who were "likely" to reoffend (when the state possessed data that confirmed otherwise), and (ii) acquiesced, and encouraged, the deliberate misuse of the above-noted assessment tools to *even further* skew the projected "likelihood" of an individual reoffending by using dramatically higher than accurate (for either the United States or the State of California) sex offender recidivism base rates and groupings.

17. These two methodologies shall be referred to herein as the "Assessment Fraud Scheme".

*(i) Fraudulent Purporting to Have Rational Actuarial Tools*

18. From 1999 to present, numerous studies were done to quantify the accuracy of the actuarial tools, used by the State of California to "assess" individuals suspected of being subject to SVPA commitment. The mechanism for doing so was through the use of "receiver operator characteristics" (herein "ROC") which enables the quantification of "true positives" (namely, those individuals who will reoffend who were correctly identified by the instrument) and "false positives" (namely, those who will not reoffend, who were misclassified by the instrument). A ROC score ranges from 0.0 (never accurate) to 1.0 (perfect accuracy). The ROC method allows the accuracy of instruments to be compared even if the instruments were developed with different base rates (namely, different than the group of individuals upon which the instrument was developed). (Grant T. Harris, et al, "A Multisite Comparison of Actuarial Risk Instruments for Sex Offenders", 15(3) Psychological Assessment 413 (2003)[2]).

19. The ROC method, of assessing actuarial tools' accuracies are both accepted, as well as used, by the authors of the actuarial tools used by the State of California in conducting its SVPA "assessments". (R Karl Hanson, et al., "STATIC-99: Improving Actuarial Risk Assessments for Sex Offenders (User Report No. 199-02)", Ottawa: Department of the Solicitor General of Canada, 1999.)

20. Prior to 2006 numerous studies identified the ROCs of the actuarial tools used by the State of California in conducting its SVPA "assessments" and provided scores ranging from 0.54-0.73 for these tools. (R Karl Hanson, et al., "STATIC-99: Improving Actuarial Risk Assessments for Sex Offenders (User Report No. 199-02)", Ottawa: Department of the Solicitor General of Canada, (1999); Kevin L Nunes, et al., "A Comparison of Modified Versions of the STATIC-99 and the Sex Offender Risk Appraisal Guide", 14 Sexual Abuse: J. Res. & Treatment 253, 265, (2002); Grant T. Harris, et al., "A Multistate Comparison of Actuarial Risk Instruments for Sex Offenders", 15(3) Psychological Assessment 413 (2003))

21. Prior to 2006, the State of California was aware of the recidivism data published by the United States Department of Justice (namely, U.S. Department of Justice, Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994", November 2003, NCJ198281), and that considering such data, along with their actuarial tools' average ROCs of 0.70, these

---

[2] All of the Reports and Studies noted within this complaint are a matter of public record and further most have been filed as Exhibits, in support of a similar Complaint, in the case of *Aaron Klein, v. Audrey King, et al.*, within the United States District Court, Eastern District of California with case number: 1:12-cv-01440 DLB PC.

CIVIL RIGHTS COMPLAINT

tools would incorrectly predict general sex offenders would recidivate approximately 90% of the time and sex offenders with child victims over 90% of the time. (A break down of the ROC analysis is contained within Tamara Lave, "Controlling Sexual Violent Predators: Continued Incarceration at What Costs?", New Criminal Law Review, Vol. 14 No. 2, pps. 213-280)

22. On, or about, 2006, Dr. Jesus Padilla, a California Department of Mental Health employee, was instructed by the state to conduct a research project examining the recidivism rates of California's sex offenders. During the course of this study, Dr. Padilla informed the state that the recidivism rates for those alleged, or deemed, to be "sexually violent predators" was far lower than the state had purportedly "anticipated".

23. Rather than stay implementation of the SVPA until the Government of the State of California discovered a means of accurately identifying those individuals who had been convicted of sex offenses who were indeed "likely" to reoffend, the state continued to use the above-noted actuarial tools and removed Dr. Padilla from his position within the government's sex offender program.

*(ii) Dramatically Higher Recidivism Base Rates and Groupings*

24. The California State Auditor published a report in July 2011 indicating that of the 13,512 individuals who had been released from California's prisons, who had committed sexually violent predatorial offenses between 2005 to July 2011, only one such individual, therefore 0.000074%, "was later convicted of a sexually violent offense during the nearly six-year period we reviewed." ("Sex Offender Commitment Program, Streamlining the Process for Identifying Potential Sexually Violent Predators Would Reduce Unnecessary or Duplicate Work", California State Auditor, July 2011, page 17)

25. Both of the authors of the Static-99, an assessment tool used by the State of California to "assist" in California determining the "likelihood" of reoffending for purposes of determining those subject to SVPA commitment, concluded "that recidivism rates in later data sets were significantly lower than in the original samples... that the revised version of the scale (Static-99R) replace Static-99 in all contexts where it is used... after it was recognized that sexual recidivism rates were much lower than in years past." ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 152-153) Despite such evidence, the State of California, in furtherance of its Assessment Fraud Scheme, continued to permit the Static-99 to be used to "assist" in its determining the "likelihood" of reoffending for purposes of identifying those deemed subject to SVPA commitment.

26. The developers of the Static-99R, an assessment tool used by the State of California to "assist" in California determining the "likelihood" of reoffending for purposes of determining those subject to SVPA commitment, have indicated that "[t]o effectively use the Static-99R as an actuarial instrument, local norms[3] are recommended, but [ ] in most SVP cases[4], local norms are not available." ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 157) The result is "a noteworthy score variation within each Static-99R reference group... For example, an evaluator who uses [one group] would find a predicted 5-year sexual recidivism rate of 8.7%... If, instead, she chose [another group], she would find a predicted 5-year sexual recidivism rate of 20.1% and a predicted 10-year sexual recidivism rate of 29.6%." ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 156-157) Despite such

---

[3] Referring to each state's sex offender data.
[4] Including the State of California.

CIVIL RIGHTS COMPLAINT

evidence, the State of California, in furtherance of its Assessment Fraud Scheme, refused to use local norms when implementing the Static-99R, which would include California's dramatically lower sexual recidivism rates than the group presently used, to "assist" in California's determining the "likelihood" of reoffending for purposes of identifying those deemed subject to SVPA commitment.

27. Despite the low recidivism rates California possessed from 2005 onwards, California's base rate, as used in the Static-99R assessment tool, was not adjusted, from the high recidivism base rate used, to reflect the state's documented recidivism rates for individuals who had been convicted of sexually violent predatorial offenses committing new sexually violent predatorial offenses. Due to its Assessment Fraud Scheme, based on the false base rate, the overwhelming majority of individuals subjected to the SVPA were individuals who would have been filtered out of SVPA proceedings had the correct base rate been used.

28. The authors of the Static-99 and Static-99R, assessment tool used by the State of California to "assist" in California determining the "likelihood" of reoffending, for purposes of determining those subject to SVPA commitment, created the "High-Risk/Needs" group, used by California evaluators to "assist" in California determining the "likelihood" of reoffending for purposes of determining those subject to SVPA commitment, based on data from the 1960s to the 1980s when "[i]n fact, between 1990 and 2004, there was a 49 percent decline in observable sexual abuse." ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 159) However, in furtherance of California's Assessment Fraud Scheme, it refused to use the correct data that would have dramatically reduced those improperly deemed "likely" to reoffend.

29. The Government of the State of California does not require those agents of the state, used to determine whether an individual within California Department of Corrections and Rehabilitation (herein "CDCR") custody may be released onto parole or instead will be subjected to the deprivation of liberty caused by the initiation of SVPA proceedings, to use actuarial instruments in the manner that is recommended by their creators which would likely create a far more accurate assessment of risk. Instead the state has implemented a process that causes over 90% of the individuals, who would otherwise be subject to release from CDCR custody, to be erroneously deprived of their liberty by such flawed process: ("High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., *Journal of Interpersonal Violence*, November 3, 2013 & "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, pages 155-163[5])

**(b) Data Demonstrates the Result of the Assessment Fraud Scheme**

---

[5] Despite Dr. Hanson, one of the developers of the STATIC-99, having indicated that its results are not reliable due to its inability to effectively consider the significant effect of the ex-offender having not committed a sex crime while within the community, the State of California continues to permit such tool to be used. ("High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., Journal of Interpersonal Violence, November 3, 2013) Despite all of the developers of the STATIC-99R having indicated that the comparison group "High-Risk/Needs" comparison group has been deemed to have data culled when "sexual-recidivism rates were much higher than they are for sex offenders recently released from confinement in the USA" ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 158), the State of California continues to refuse to use the appropriate groups nor base rates resulting in dramatically higher than valid predicted recidivism rates. The results of such flawed process is that 93.5% of those whom the state deemed were "likely" to commit sexually violent offenses if not imprisoned in an inpatient program were erroneously subjected to the deprivation of liberty caused by the SVPA.

CIVIL RIGHTS COMPLAINT

30. The State of California possessed data indicating that the "likelihood" of a high-risk sex offender committing a sex offense if released into the community declines significantly when such individuals are adequately supervised within the community. For example, the State of California possesses data that the "likelihood" of a high-risk sex offender committing a sex offense if released into the community, wherein such individuals are provided with Global Positioning System (GPS) monitoring, reduces by approximately 60%[6]. ("Monitoring High-Risk Sex Offenders With GPS Technology: An Evaluation of the California Supervision Program Final Report", Stephen V. Gies, et al., Development Services Group, Inc., by grant of the National Institute of Justice, Office of Justice Program, page 3-9) Despite the awareness of such data, the State of California has refused to adjust their predicted rates of reoffending, for those subject to SVPA "evaluations", to include the significant reductions attributable to such monitoring techniques in assessing their "likelihood" of reoffending if released into the community with supervision.

31. The State of Texas, which demonstrates, through successfully implementing an entirely outpatient sexually violent predator commitment program for a period in excess of a decade wherein not one individual committed to its program committed a new sexually violent predatorial offense, that the least restrictive means of safely fulfilling the purposes of the SVPA is through outpatient treatment. ("Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Inpatient vs. Outpatient SVP Civil Commitment", Texas Department of State Health Services, 2010)

32. The State of Maine possesses data demonstrating that those individuals within the State of Maine, who had committed sexually violent predatorial offenses and who were not subjected to restrictive inpatient California SVPA style "treatment" did *not* commit new sexually violent predatorial offenses at a rate significantly greater than sex offenders in general.

33. The State of Florida possesses data demonstrating that those individuals within the State of Florida, who had committed sexually violent predatorial offenses and who were not subjected to restrictive inpatient California SVPA style "treatment" did *not* commit new sexually violent predatorial offenses at a rate significantly greater than sex offenders in general ("Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., International Journal of Offender Therapy and Comparative Criminology, January 19, 2012, page 14[7]; "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 160)

---

[6] Please see Page 3-9 of "Monitoring High-Risk Sex Offenders With GPS Technology: An Evaluation of the California Supervision Program", Stephen V. Gies, et al., 2012, National Institute of Justice, Office of Justice Programs, U.S. Department of Justice

[7] "Current meta-analytic reviews suggest that the average sexual re-offense rate for all known sexual offenders, post criminal sanction, is approximately 13% to 15% over a follow-up period of approximately 5 years." ("Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., International Journal of Offender Therapy and Comparative Criminology, January 19, 2012, page 5)

"Both samples [within 5.5% within Canada and 3.2% within the State of Florida's 'high-risk' sex offenders] are certainly reoffending sexually at rates considerably below rates projected by the Static-99 (26.2%) or Static-99R (20.1%) experience table using the 5-year logistic regression results." ("Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., International Journal of Offender Therapy and Comparative Criminology, January 19, 2012, page 14)

"Given the currently available normative rates of sexual recidivism requirements… we believe that this approach may assist SVP jurisdictions in balancing the need for protection of community safety while maintaining offenders in less restrictive environments where appropriate." ("Comparing Sexual Offenders at the Regional

CIVIL RIGHTS COMPLAINT

34. The State of Connecticut possesses data demonstrating that those individuals within the State of Connecticut, who had committed sexually violent predatorial offenses and who were not subjected to restrictive inpatient California SVPA style "treatment" did *not* commit new sexually violent predatorial offenses at a rate significantly greater than sex offenders in general. ("Recidivism among sex offenders in Connecticut", State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division, February 15, 2012., page 32[8]; "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 160)

35. The State of California possesses data indicating that individuals, whom the State of California alleged were sexually violent predators subject to SVPA commitment and who were nonetheless released into the community had an "observable sexual recidivism rate" of 6.5%. ("Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny, page 160) Thus these alleged by California to be sexually violent predators did *not* commit new sexually violent predatorial offenses at a rate significantly greater than other individuals who had be convicted of sexually violent predatorial offences and not alleged by the state to be subject to SVPA commitment.

36. The State of California possess data indicating that those who have been conditionally released into the community, after having been committed under the SVPA, do *not* commit new sexually violent predatorial offenses at a rate significantly greater than other individuals who had be convicted of sexually violent predatorial offences and not alleged by the state to be subject to SVPA commitment.

37. A 2013 empirical evaluation of the data relevant to "sexually violent predators" throughout the United States, including in California, demonstrates that the assessment tools and methods, purported to be used to distinguish those who are "likely" to reoffend from those who are not, have systematically failed to do so. (Tamara Lave and Justin McCrary, "Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process? An Empirical Inquiry", Brooklyn Law Review, 2013)[9]

### (c) Denial of Outpatient Treatment Benefits

38. Outpatient treatment programs have been demonstrated to be far more effective at treating the mental disorders, of those who have committed sexually violent predatorial offences, than the inpatient scheme mandated by the SVPA. ("Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Inpatient vs. Outpatient SVP Civil Commitment", Texas Department of State Health Services, 2010 & "High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., *Journal of Interpersonal Violence*,

---

Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., International Journal of Offender Therapy and Comparative Criminology, January 19, 2012, page 16)

[8] Despite actuarial tests, similar to those used for California's SVPA "civil commitment" scheme, indicating a class of sex offenders released from Connecticut prisons were "highest risk" of committing new sex offenders 0% of such "high risk" sex offender were convicted of new sex crimes and for the second highest risk level of such sex offenders released from Connecticut prisons, 3.5% were convicted of new sex crimes. ("Recidivism among sex offenders in Connecticut", State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division, February 15, 2012, page 32)

[9] Tamara Lave and Justin McCrary, "Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process? An Empirical Inquiry", 78 Brooklyn Law Review, 1391, 1392 (2013).

CIVIL RIGHTS COMPLAINT

November 3, 2013[10]) The benefits of such outpatient programs are not available for those that come under the SVPA's mandatory inpatient scheme.

39. Such benefits of outpatient treatment *are* available for a similarly situated group of individuals, namely those who have committed the exact same offenses and suffer from the exact same disorders but who have *not* been arbitrarily deemed by California's Assessment Fraud Scheme to be unable to be safely treated within the community, despite there being no actuarial tool nor assessment means of even remotely accurately determining the likelihood of such an ex-offender being able to be safely treated within the community – thus any means used to distinguish who receives and does not receive such benefits is merely irrationally and arbitrarily decided. ("Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Inpatient vs. Outpatient SVP Civil Commitment", Texas Department of State Health Services, 2010, "Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Texas Supreme Court Decisions, 2010, "Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., *International Journal of Offender Therapy and Comparative Criminology*, January 19, 2012, "Recidivism among sex offenders in Connecticut", State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division, February 15, 2012, "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny[11])

40. Such benefits of outpatient treatment have been deemed to effectively "cure"[12] sex offenders: Dr. Karl Hanson, one of the authors of multiple assessment tools used by the State of California to "assist" in California determining the "likelihood" of reoffending for purposes of determining those subject to SVPA commitment[13], re-evaluated the data used in creating such assessment tools. Such re-evaluation has demonstrated "that sexual offenders' risk of serious and persistent sexual crime decreased the longer they had been sex offense-free in the community. This pattern was particularly evident for high risk sexual offenders, whose yearly recidivism rates declined from approximately 7% during the first calendar year, to less than 1% per year when they have been offence-free for 10 years or more. Consequently, intervention and monitoring resources should be concentrated in the first few years after release, with diminishing attention and concern for individuals who remain offence-free for substantial periods of time." ("High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., Journal of Interpersonal Violence, November 3, 2013: Page 12) The state of California refused to require the author's tools be used in a manner that adjusted its predicted recidivism rates to consider Dr. Hanson's findings. Thus firstly, those deemed subject to SVPA proceedings were *not* provided a process wherein the tools were used properly to evaluate their

---

[10] It has been demonstrated that the likelihood of a sex offender re-offending after 10 years within a community based program falls to the level of one who has never been convicted of a sex offense in his life -- thus he is effectively "cured" of his mental disorder. Such a beneficial result is not evidenced by inpatient schemes such as that mandated by the SVPA. ("High Risk Sex Offenders May Not Be High Risk Forever", R. Karl Hanson, et al., Journal of Interpersonal Violence, November 3, 2013, page 12)

[11] Each of these reports demonstrate that data from multiple states, including the State of California, demonstrate conclusively that the **overwhelming majority** (over 90% in most cases and approximately 94% in the State of California) of those whom, according to the actuarial data and evaluations mandated by the SVPA's assessment protocol, would be deemed "likely" to re-offend if treated within the community in fact *have not re-offended* upon their release into the community as had been predicted.

[12] "The term "cure" is used to refer to someone who is no more likely than a non-sex offender to commit a sexual offense.

[13] Namely, STATIC-99 and STATIC-99R.

"likelihood" of re-offending and secondly, the SVPA was not amended to incorporate Dr. Hanson's findings which demonstrated that *outpatient treatment*, within the community, results in a dramatic fall in the likelihood of re-offending that is not present when an such ex-sex-offenders are not provided with *in-community treatment*.

41. California's SVPA has been deemed civil and non-punitive due to its having been construed as indicating that those who come within its ambit will be held only "as long as he is both mentally ill and dangerous, but no longer… [Thus until he is] safe to be at large [whereupon] he is statutorily entitled to immediate release." (*People v. McKee* (2010) 47 Cal. 4th 1172, 1193)

42. Despite the California Supreme Court's interpretation of the SVPA, as noted above, indicating that Plaintiff, as with all those that come under the ambit of the SVPA, shall be held *no longer* than such period as he poses a danger to the community and as the above data has demonstrated that all those who come under the SVPA *never* pose a danger to the community, when afforded appropriate supervision, the Defendants have nonetheless failed to release Plaintiff into an outpatient treatment program.

43. Despite other states, including the State of Washington and the State of Texas having demonstrated that the least restrictive means of safely fulfilling the purposes of the SVPA is through outpatient treatment, the State of California has refused to amend their SVPA to ensure it provides such least restrictive means[14].

44. Despite the State of California having no means of even remotely accurately identifying those individuals who are "likely" to commit sexually violent predatorial offenses with appropriate supervision if not "civilly committed" within an inpatient setting[15], the State of California systematically claims that it *has* in fact identified such individuals and then initiates SVPA proceedings where the alleged committee is deprived of the benefits of outpatient treatment.

## V. CLAIM

Plaintiff realleges and incorporate by reference all of the above.

Plaintiff has a claim under 42 U.S.C. §1983 for violations of the following federal constitutional civil rights:

**Violation of the Plaintiff's Procedural and Substantive Due Process Rights, under the Fourteenth Amendment, to not be subjected to an irrational assessment method of determining that Plaintiff is prohibited from taking part in outpatient treatment.**

---

[14] See Fns. 3, 4 above.

[15] "Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Inpatient vs. Outpatient SVP Civil Commitment", Texas Department of State Health Services, 2010, "Council on Sex Offender Treatment Civil Commitment of the Sexually Violent Predator – Texas Supreme Court Decisions, 2010, "Comparing Sexual Offenders at the Regional Treatment Centre (Ontario) and the Florida Civil Commitment Center", Robin J. Wilson, et al., *International Journal of Offender Therapy and Comparative Criminology*, January 19, 2012; "Recidivism among sex offenders in Connecticut", State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division, February 15, 2012 and "Forensic Use of the Static-99R: Part 3. Choosing a Comparison Group", Gregory DeClue & Denis L. Zavodny demonstrate that data from multiple states, including the State of California, demonstrate conclusively that the **overwhelming majority** (over 90% in most cases and approximately 94% in the State of California) of those whom, according to the actuarial data and evaluations mandated by the SVPA's assessment protocol, would be deemed "likely" to re-offend if treated within the community in fact *have not re-offended* upon their release into the community as had been predicted.

CIVIL RIGHTS COMPLAINT

Violation of Plaintiff's Procedural and Substantive Due Process Rights, under the Fourteenth Amendment, to not be deprived of adequate treatment.

Violation of Plaintiff's right to not be deprived of the benefit of outpatient treatment that those similarly situated are provided with contrary to the Fourteenth Amendment's Equal Protection Clause.

Violation of Plaintiff's Substantive Due Process Fourteenth Amendment Right to not be subjected to conditions that are excessively restrictive in relation to their purported purposes.

The above civil right was violated by the Defendants during the entire period, from or about MARCH 2012 to present, when Plaintiff was within the custody of the Defendants due to Plaintiff being deliberately deprived of the adequate and far less restrictive outpatient mental health treatment due to Plaintiff having been deliberately subjected to an "assessment method" which Defendants firstly knew was irrational and secondly was being implemented in a manner to irrationally dramatically increase the projected probability of there being a substantial "likelihood" that Plaintiff would commit a sexually violent predatorial offense if he were to be treated within the community, irrespective of whether he were to be adequately supervised within the community.

**Defendants had policies and customs that permitted such violations, namely: (i) policies and customs which permitted the use of irrational actuarial tools; (ii) policies and customs which permitted courts of this nation to be misled to believe that such actuarial tools were rational despite Defendants knowing such tools were irrational; (iii) policies and customs which permitted the improper use of "assessment tools" to irrationally increase the projected probability of alleged, and committed, "sexually violent predators" committing sexually violent predatorial offenses if released into the community irrespective of whether he were to be adequately supervised within the community; (iv) policies and customs which permitted such "assessment methods" to exclude the effects of Global Positioning Supervision (GPS) monitoring to cause an irrational dramatic increase in the projected probability of alleged, and committed, "sexually violent predators" committing sexually violent predatorial offenses if released into the community irrespective of whether he were to be adequately supervised within the community; (v) policies and customs that permitted such "assessments" to use invalid data, "base rates" or "groupings" to cause an irrational dramatic increase in the projected probability of alleged, and committed, "sexually violent predators" committing sexually violent predatorial offenses if released into the community irrespective of whether he were to be adequately supervised within the community; (vi) policies and customs that irrationally deprived alleged, as well as committed, "sexually violent predators" of the substantial benefits of outpatient treatment; (vii) policies and customs that required the staff under the supervision of Defendants to deliberately disregard the treatment needs of alleged, and committed, "sexually violent predators" through such staff's acquiescence to such patients' irrationally being deprived of the substantial benefits of outpatient treatment; and (viii) policies and customs that required the staff, under the Defendants' supervision, to acquiesce to depriving those patients under their care of the less restrictive means of meting the purported purposes of California's Sexually Violent Predator Act.**

The facts that support this claim are listed above in IV. Statement of Facts

As a result of the Defendants' violation of the above-noted civil rights, Plaintiff was harmed in the following ways:

Plaintiff experienced emotional suffering. Plaintiff was not permitted to begin effective outpatient psychological treatment and Plaintiff was deprived of the increased liberty he would have experienced within an outpatient treatment setting.

## VI. REQUEST FOR RELIEF

WHEREFORE, the Plaintiff requests:

1. Declaratory relief in the form of a declaration that the assessment methodology used by the State of California, ostensibly pursuant to its SVPA to determine that an individual may *not* take part in outpatient treatment, is irrational contrary to the Procedural Due Process rights within the Constitution's Fourteenth Amendment.

2. Punitive Damages in the amount of $10,000,000.

Dated: November 9, 2014

Respectfully Submitted,

*[signature: James Hamilton]*

*Plaintiff in Pro Se*

Douglas MacKenzie
Patient No.: 1656-8
Coalinga State Hospital
P.O. Box 5003
Coalinga, CA 93210-5003

LEGAL MAIL

SANTA CLARITA
CA 913
13 NOV'14
PM 7 L

neopost
11/13/2014
US POSTAGE
$00.90
FIRST-CLASS MAIL
ZIP 93210
041L11212894

RECEIVED
NOV 17 2014
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Deputy Clerk of the Court
United States District Court
Central District of California
312 North Spring Street
Los Angeles, CA 90012